[Civ. No. 4903.   Third Appellate District.—September 24, 1934.]

MAGGIE E. DRYDEN, as Administratrix, etc., Appellant, v. WESTERN PACIFIC RAILROAD COMPANY (a Corporation), Respondent.

J. Oscar Goldstein for Appellant.

C. W. Dooling, Edwin V. McKenzie and H. B. Wolfe for Respondent.

PULLEN, P. J.—Plaintiff, as administratrix, brought an action under the provisions of an act of Congress entitled "An Act relating to the Liability of Common Carriers by Railroad," etc., approved April 22, 1908, and amendments thereto, for the death of her son, who was killed while an employee of defendant Western Pacific Railroad Company. The issues were tried before a jury, who returned a verdict

in favor of defendant, and plaintiff now appeals from the judgment thereon.

The original complaint set up specific acts of negligence, but prior to the trial an amended complaint was filed, the first count containing the specific allegations of negligence as set forth in the original complaint, and the second cause of action alleging general negligence.

The deceased at the time of his death was employed by defendant as a freight conductor. On the evening of May 20, 1931, as such freight conductor, he took charge of a freight train at Portola on the Western Pacific system, consisting of some seventy loaded cars and left with the train westbound for Oroville. About two miles west of Spring Garden, and while going around the "Loop", a box car, about the fifth or sixth from the caboose, became derailed. In the rerailing operation this car suddenly toppled over, killing Conductor Dryden, and for his death this action was brought.

The car in question was a Western Pacific box car having a permissible loading capacity of 95,000 pounds. The cargo consisted of bars of pig lead, each weighing approximately 75 pounds, the total load aggregating 90,056 pounds. This car had been loaded and sealed at Murray, Utah, on the line of the Denver and Rio Grande, and was received by the Western Pacific at its eastern terminal at Salt Lake City. The car was destined for Selby Smelting and Lead Company in Contra Costa County, California. Respondent was transporting it as an intervening carrier to Oakland, at which point it would be turned over to the Southern Pacific Company. It is conceded the Western Pacific is engaged in interstate commerce and that it owned the roadbed and car here involved.

Proceeding now to a narrative of the events preceding the death of the conductor we find that the train of which this car was a part, arrived at Portola, a division point on the Western Pacific about 6 o'clock on the evening of the accident. The train was there made up and inspected preparatory to continuing westward, under the direction of Jacob Dryden as conductor. When the train entered and when it left Portola it was given a rolling inspection in addition to a standing inspection while in the yard. The standing inspection was made by car inspectors who exam-

ined each car in the train for mechanical defects in safety appliances, running gear, side bearing clearance, etc. The inspector who examined the car in question at Portola testified there was nothing apparently wrong with the car and the side bearing clearance was between the minimum of $\frac{1}{8}$ of an inch and maximum of 5/16 of an inch. Side bearing clearance is the space between two side bearings and determines whether the car itself is riding on the center bearing. If the intervening space between the upper and lower portions of either side bearing on either truck is above the maximum or below the minimum it is an indication of a tilt in the car, indicating a shifted load. The car was sealed and no inside inspection was made at any time prior to the accident. It was testified in that regard that when a box car was brought into the division sealed and it showed normal with respect to side bearing clearance and in all other respects, the seal was not broken. If the side bearing clearance was not normal the car was opened and an examination made.

After leaving Portola the train and car in question received a rolling inspection at Sloat, about seven miles west of Portola. Spring Garden is about twenty miles farther south of Portola, where a standing inspection was again made, this time by the conductor and one of the brakemen, who walked from the rear of the train to the engine and examined each car in the train,—the conductor on one side and the brakeman on the other. Nothing unusual was found and no indication of a shifted load in the car of bullion. As the train was proceeding westerly from Spring Garden at about eighteen miles per hour, rounding the loop which approximates an eight-degree curve with a difference in elevation between the high and low side of the curve of about four inches, the car here in question left the track. The train was stopped and on examination it was found the forward truck had left the rails and was resting on the ties of the roadbed, a few inches from the rails, the rear truck still on the rails. The derailed car was uncoupled from the rest of the train, and the engine took the cars ahead of the derailed car to Massack and then returned to assist in the rerailing operations. In the meantime a section crew had arrived. The conductor and others of the train crew inspected the car from the outside, but observed nothing

that would indicate a shifted load. In order to rerail the car it was necessary to raise the trucks high enough to permit the flange of the outer wheels to slip over the outer and higher rail and drop into place. To do this the conductor directed that frogs, or rerailing irons be used. This contrivance is somewhat in the shape of an elongated turtle and enables the wheels to be drawn gradually up the incline plane of the turtle back to the required height and permits the flange to slip into its accustomed place on the inside of the rail. The low frog was placed on the inside of the curve and the high frog on the outside and spiked to the ties just ahead of the wheels of the derailed truck.

Deceased was standing on the inside of the curve and near the front end of the derailed car where he could observe the operations and supervise the work. After the frogs were adjusted and spiked to his satisfaction, he gave the signal to the engineer to proceed ahead slowly. The car moved forward very slowly and gradually the forward truck lifted on the frogs when suddenly the car toppled and fell upon its side, pinning Dryden beneath it, causing his death. The cause of the accident is ascribed by appellant to the shifted load. It is claimed no bracing was used to hold the bars of lead from slipping, and the jolting of the car in its travel caused the load to shift, derailing the car and causing it to topple over when lifted on to the frogs. The respondent, however, claims the truck slipped on the frogs and rotated toward the inside, disturbing the equilibrium, and the flange of the wheels on the inside of the curve passed over the rail, causing the car to topple over, and was not the result of any shifted load.

Appellant urges some twenty-two points for reversal including errors in the admission and rejection of evidence during the trial and errors in instructions. ▮▮ The principal objection, however, seems to relate to the conclusion of the court that the doctrine of *res ipsa loquitur* was not applicable. It is suggested that the doctrine is not applicable for the reason such doctrine is not accepted under the rules of federal practice, and inasmuch as respondent is a carrier engaged in interstate commerce the rules of law of the federal courts rather than our state courts are to be applied. (2 Roberts Federal Liabilities of Carriers, 2d ed., pars. 812, 813; *Smithson* v. *Atchison, T. & S. F. Ry. Co.,* 174

Cal. 148 [162 Pac. 111] ; *Conner* v. *Atchison, T. & S. F. Ry. Co.*, 189 Cal. 1 [207 Pac. 378, 26 A. L. R. 1462].)

The claim that the doctrine is not applicable in the federal court is strenuously denied by appellant and in view of the apparent uncertainty of the federal practice we prefer to leave that to a federal forum for a clear declaration of its policy, but we do believe that the doctrine of *res ipsa loquitur* is not here applicable for another reason. In the instant case the deceased was the conductor of the train and as such in charge thereof. It was his duty to inspect cars making up his train, which in fact he did. He also had in his possession a train sheet and way bills showing the contents of each car in the train, its point of origin and destination. When the car was derailed it became his duty either to attempt rerailment by the use of the frogs, assisted by his train crew and the section men or to summon the aid of a wrecking crew. He chose to attempt the rerailment by the use of the equipment at hand. He supervised the placing of the frogs and it was the deceased who gave the signal to proceed and he himself chose his position on the inside of the curve and within the area of the car if it should fall. In other words, the train, its contents, the crew and the rerailing operations were under the immediate direction and command of the deceased as conductor. The doctrine of *res ipsa loquitur* cannot therefore be held applicable to the deceased. ▮ Such a rule can only be held applicable when the control of the instrumentality is in the employer or its servants, other than the injured person, for the doctrine itself is predicated on the principle that those in control have in some way been negligent. If therefore the servant, who himself has control, has been negligent and thus brings about the accident, he cannot recover, for there can be no recovery by a servant against the master for his own wrong. (*Brown* v. *Board of Trustees*, 41 Cal. App. 100 [182 Pac. 316] ; 19 Cal. Jur. 708, and cases there cited.) The authorities relied upon by appellant, namely, *Rost* v. *Kee etc. Dairy Co.*, 216 Ill. App. 497, and *Goldman & Freiman Bottling Co.* v. *Sindell*, 140 Md. 488 [117 Atl. 866], were cases where plaintiffs were injured by particles of glass in a bottle of milk and do not go so far as to suggest that a customer who purchases such a bottle of milk is in "control" of the instrumentality. Neither, of course, was the

seaman in *Lejeune* v. *General Pet. Co.*, 128 Cal. App. 413 [18 Pac. (2d) 429], in "control" of the vessel or the operation of the winch, both different situations than where a conductor is in charge of a railroad train.

The court also properly held, and so instructed the jury, that it could not consider the circumstances of the derailment of the freight car which toppled over, or the causes which brought about the derailment or any asserted negligence with respect to the derailment as bearing in any way upon the subsequent accident, there being as a matter of law no proximate cause existing between the derailing and the accident.

As was said in the case of *Great Northern Ry. Co.* v. *Wiles*, 240 U. S. 445 [36 Sup. Ct. 406, 60 L. Ed. 733], where a drawbar of a freight train drew out, breaking the train into two sections. Under the rules of the railroad it became the duty of the brakeman to go to the rear and flag any oncoming train. This he failed to do but remained in the caboose. An engine ran into the rear of the train killing the brakeman. In an action brought for his death the court found in favor of the company, saying: "The pulling of the drawbar produced a condition which demanded an instant performance of duty by Wiles—a duty not only to himself but to others. . . . It is therefore seen that the pulling out of a drawbar and the stopping of the train caused thereby, merely created the condition out of which arose his duty to act."

Irrespective of the cause of the derailment it merely produced a condition which required the performance of certain duties upon the part of the deceased. It made no difference what caused that derailment; whatever its cause might have been, it had no effect as a legal casualty to the subsequent toppling over of the freight car.

Appellant also complains of the giving of an instruction that the defendant was not required to supervise the loading of a car originating on a foreign railroad, its duty being to inspect said cars in an ordinarily prudent manner when they were received by the intervening carrier. It will be recalled that the car in question was a freight car loaded on the lines of the Denver & Rio Grande Railroad, and was received by defendant at its terminal at Salt Lake City. Upon being loaded the car was sealed. It cannot be

that a railroad receiving cars loaded upon lines outside of its system is required to break the seal and examine the contents of every car so received unless there is something to indicate a necessity therefor. The car in question had been inspected for side bearing clearance, running gear, etc., at various points and stations along the way of the Western Pacific, and at no time does it appear that there was any indication of anything unusual in regard to the particular car in question.

The fact is stressed by appellant that the derailed car was a Western Pacific car and the accident occurred upon the system of the Western Pacific, but that of course is not important, for the ownership of the car was merely incidental, the real fact being that the actual loading was done upon another road and under that company's supervision. The citation by appellant of 39 Corpus Juris, 388, does not support his contention.

The rule seems to be that the connecting lines owe a duty to employees to exercise reasonable care to see that such cars are in proper condition.

The rule is well expressed and amply supported by authority in 26 Cyc. 1110, as follows:

"While there are decisions to the effect that the responsibilities of a railroad company to its servants are the same in respect to cars of other companies which the servants are compelled to handle as in respect to its own, the better view seems to be that the duty of a railroad company in respect to a car received by it for transportation over its roads in the ordinary course of business, is one of inspection only, and that it is not to be held responsible for latent defects which cannot be discovered by such an inspection as the exigencies of traffic will permit in the exercise of reasonable care. . . .

"Where the servant of a railroad company is injured by reason of the improper loading of a car received from another company, or which has been loaded by the shipper, the company is not liable unless it has been in the habit of receiving and transporting cars loaded in such a manner, or unless it has failed to provide a system of inspection and proper persons to inspect cars after they have been loaded and before they have been received for transportation. . . .

"An inspection will be presumed to have been proper in the absence of evidence to the contrary." (*Oglesby* v. *Missouri Pac. R. Co.*, 150 Mo. 137 [37 S. W. 829, 51 S. W. 758].)

No claim is here made that the inspections as made were improper, except as to failure to examine the interior of each car.

█ Another point urged by appellant is that the court erred in refusing to admit a telegram sent to A. J. Christensen, trainmaster at Portola, by X. L. Owens, yard clerk at the same point, acting, so appellant claims, under the order of J. M. McSweeney, trainmaster. This telegram was sent shortly after the accident here in question, directing that inspectors thereafter open all cars of bullion and inspect the same for shifted loads. Appellant claims that the telegram was admissible as bearing upon the veracity of certain witnesses, and also because it tended to show knowledge on the part of defendant's agents that the bullion may have been improperly loaded. The ruling of the trial court was not error. The telegram was admittedly sent by a clerk of defendant after the accident. It was not part of the *res gestae* and in the absence of authority from an official of the company it was not binding upon it. It is analogous to an attempt after an accident caused by a dangerous instrumentality to show installation of safety devices. █ A declaration of an agent to be admissible under the doctrine of *res gestae* must be within the scope of his authority and concerning the act or transaction pending at the moment. (*Froeming* v. *Stockton Elec. Ry. Co.*, 171 Cal. 401 [153 Pac. 712, Ann. Cas. 1918B, 40]; *Willard* v. *Valley Gas & Elec. Co.*, 171 Cal. 9 [151 Pac. 286]; *Hoffman* v. *Southern Pac. Co.*, 168 Cal. 627 [143 Pac. 1032]; *Burgesser* v. *Bullocks*, 190 Cal. 673 [214 Pac. 649]; 10 Cal. Jur., p. 1116.)

As to the alleged errors in admission or rejection of evidence we believe the rulings were correct in the main although as to some of the minor objections the court might have reached a different conclusion, but it could not legally have effected a change in the result.

█ It must be recalled that a jury has passed upon the issues of fact here presented and the rule is well established that on appeal all of the circumstances of the case, together

58

with their respective inferences which may be drawn therefrom, will be marshaled in support of the judgment.

Many other points are presented by counsel for appellant, all of which have been closely examined, but we believe no useful purpose will be performed by setting forth more in detail than we have already done. Counsel for both appellant and respondent have been able and industrious in presenting the many questions involved but we have found nothing to merit a reversal.

The judgment is affirmed.

Plummer, J., and Thompson, J., concurred.